# Richmond

LEWIS BLYDENSTEIN v. W. A. BUSSEY, ET AL.

November 16, 1933.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*J. M. Perry* and *John D. White,* for the plaintiff in error.

*J. Wesley Taylor* and *Timberlake & Nelson,* for the defendants in error.

HUDGINS, J., delivered the opinion of the court.

W. A. Bussey, and others, instituted attachment pro-
ceedings against Lewis Blydenstein, a non-resident, claim-
ing damages for a breach of contract for sale of real estate.
The jury returned a verdict of $4,000, which the trial court
refused to disturb.

The defendant, born in Holland, came to the United
States in 1917 and settled in Augusta county, Virginia,
where he acquired certain real estate, including "Pine Hill
Orchard," the property described in the alleged contract
of sale. In March, 1932, he moved to Florida, where he
was residing at the time of the trial.

Before defendant left for Florida, he called to see W. L.
Dally, a real estate agent of Waynesboro, and placed in
his hands for sale his residence property in Waynesboro
and the orchard here in question. With the exception of
this one interview, all communications between the owner
and the agent were by telegrams or letters.

On March 8, 1932, a few days after the verbal interview,
defendant wrote to Dally from Florida, the opening sen-
tence of which letter reads: "I want to confirm herewith
my talk with you about the sale of my property in Vir-
ginia." Then follows a description of his residence and
Pine Hill Orchard, with the price and terms upon which
he was willing to sell. The last typewritten paragraph in-
forms the broker that both properties were subject to a
mortgage, and in event of sale the money would have to
be paid to the National Bank and Trust Company at Char-
lottesville, Virginia. At the close of the letter, in the
handwriting of defendant, is a paragraph stating that "Mr.
C. M. Lilly, the caretaker, is living at present in the six-
room bungalow (on the orchard property), and I have a
contract with him till 31st December, 1932."

The original price placed on the orchard property was
$5,000. Several communications were exchanged between
Blydenstein and the real estate agent. Blydenstein was
anxious to sell and from time to time reduced the price
which he was willing to take for his property; but Dally
could not, or did not, obtain a purchaser. On July 12,

Dally telegraphed Blydenstein that he was offered $2,300 for the orchard and equipment, $1,000 cash and balance in one and two years. Not hearing from this telegram, on the same day he wired again. Late in the afternoon of that day Blydenstein telegraphed that he would take $2,300 for the orchard, $1,000 in cash and balance in two years. On the next day, Dally telegraphed Blydenstein that he had sold per terms of the wire, and on the same day wrote the following letter:

"This will confirm wire of this date:

"Orchard and equipment sold per terms of wire of 11th. Stop. Mail your deed will have Branaman make deed to purchaser. Signed, W. L. Dally.

"Sold the orchard to Bussey, Stump and Agnor, please get the deed to me by first mail, will have the bonds and deed of trust prepaired, will forward deed for signatures as soon as your deed is received and deed to purchasers made."

On July 15, Blydenstein replied as follows:

"I received your letter of 13th July '32 and wrote the National Bank & Trust Co., Charlottesville, Va. to mail you the deed of the Pine Hill Orchard at once.

"As I wrote you in my letter of 8th March '32, I have a contract with Mr. C. M. Lilly, the caretaker, to work in the orchard till the 1st January, 1933, that means of course, that after the orchard is sold, he will occupy the house on the property till the 1st January 1933 and work during that time for the owners."

On July 21, Dally wrote Blydenstein that he had seen the bank in Charlottesville and arranged to release the mortgage, and enclosed a draft of a deed to be executed by Blydenstein, with the request that it be returned at once. In this letter Dally does not refer to Blydenstein's letter of July 15, nor does he mention the time possession of the property is to be given purchaser.

Promptly on July 25, Blydenstein wrote Dally as follows:

"I received your letter of 21st July '32 with the deed of the Pine Hill Orchard in which is stated:

" 'The Grantees shall have full possession of the real estate and personal property, hereby sold, on 1st August 1932.'

"Because I don't notice anything in the deed about my contract with Mr. C. M. Lilly to work in the Pine Hill Orchard till 1st January, 1933, I return the deed herewith. Please write in the deed, that the Grantees will continue my contract with Mr. C. M. Lilly from 1st August, 1932, of which contract I send you a copy herewith."

On July 27 Dally replied to this letter as follows:

"This will acknowledge your letter of the 25th.

"Note what you say about Mr. Lilly's contract not being mentioned in the deed, you did not tell me that Mr. Lilly had to go along with the orchard, you mentioned in a foot note when you wrote me March 8, 1932, that you had a contract with Lilly, but nothing was said about a purchaser taking over your contract.

"I wired you an offer for the orchard July 11th, and on the 12th, you wired your acceptance, without any reservations.

"The purchasers of the orchard cannot use Mr. Lilly, but are willing to allow him to remain in the house until December. Am enclosing deed, please sign and return to the bank at Charlottesville, for signatures. When sale contract was signed, August 1st was delivery date."

On July 19, C. M. Lilly wrote Blydenstein that Dally had informed him the place was sold, and wanted to know if that was a fact, and if it had not been sold to give him a low price on it, calling Blydenstein's attention to the contract between them. On July 23, Lilly wired Blydenstein, offering to pay $3,000 for the property if it had not been sold, following the wire with a letter stating that he would pay cash for the property. On July 29, Blydenstein wired Dally as follows:

"Orchard sold to other party have written Hugh *Keer*

Attorney Staunton Will pay you five percent of two thousand three hundred—"

On August 15, these attachment proceedings were instituted and subsequently Mr. Hugh Kerr, the attorney mentioned in the communications between Blydenstein and Lilly, died and the deal between Blydenstein and Lilly was not consummated.

This action is based on the contract of sale signed by Dally, as agent for the owner, claiming $5,000 for its breach. The defense to the action was (1) that W. L. Dally, the real estate agent, had no authority to execute a contract of sale for and in behalf of Blydenstein; (2) that he had no authority to sell the property without making due provision for Blydenstein's contract with Lilly, the party in possession.

The only evidence tending to show that Blydenstein authorized the real estate agent to sign a contract of sale is the testimony of the agent himself. This agent states that when Blydenstein called on him he showed him a printed form of sales contracts and told him that in case of sale he would have to sign the contract for him, that it was customary for agents to sign the owners' names to contracts and he always did it, and that Blydenstein agreed.

We are not informed as to what may be the local custom in Waynesboro, but the general rule is that a real estate agent is a special agent, with limited powers, whose duty is simply to find a purchaser ready, willing and able to enter into a contract upon terms and conditions fixed by the owner, and that authority for him to bind the owner is never presumed, but must be proven in express terms or by clear implication.

Defendant testified in positive terms that he gave the real estate agent no such authority. A few days after he had listed the property, he wrote the letter of March 8, confirming the listing and setting forth the terms and conditions upon which he would sell. He said nothing about having given the agent authority to sign his name and in the numerous communications between the parties before

the controversy arose there was no reference to the fact that the agent had this authority, nor did he call the omission to the owner's notice.

Assuming that the testimony of the agent was sufficient to carry to the jury the question of his authority to execute a contract for the owner, we are of opinion that plaintiffs are not entitled to recover.

A real estate agent, in order to bind his principal, must strictly conform to the terms and conditions of sale fixed by the owner, and any material variation therefrom is fatal to the validity of the sale. Where property listed for sale is occupied, the time possession is to be surrendered by the owner to the purchaser is a question of importance. In confirming the listing of the property and stating the terms of sale, it was stated that the owner was under a contract with the person in charge until January 1, 1933. The purpose of giving this information to the agent is apparent. The agent owed to the owner the duty of exercising the utmost good faith, and in attempting to sell the property to offer it only upon the terms and conditions specified. If he claimed the right to bind the owner, it was his duty to guard his interest with the utmost fidelity. This he failed to do—with knowledge that the owner had no right to oust Lilly from possession until January 1, 1933, he attempted to bind the owner to give possession, regardless of Lilly's rights, on August 1.

As soon as the owner received the letter notifying him of the sale, he, on July 15, before he had any inquiry from another possible purchaser, notified the agent that the purchaser would be required to assume the contract with the occupant of the premises.

Plaintiffs were unwilling to assume this obligation and, through their attorney, notified the real estate agent that the purchasers had made "a clean-cut purchase of the property" and that "the objection about the tenant's contract comes entirely too late, as the purchase was consummated under clear authority to you (Dally) from Mr. Blydenstein and without any reservation whatever."

Plaintiffs knew that they were making a contract with a real estate broker, who, ordinarily, has no authority to bind the owner by contract. In order to enforce such a contract or recover damages for its breach, the burden was upon them to show the authority in the agent, and that he had exercised that authority in strict compliance with the terms and conditions fixed by the owner. This burden they have failed to carry.

The telegrams exchanged on July 12, between Dally and Blydenstein, contained no authority to the agent to execute a contract for the owner, and no such claim is made. The only evidence of any such authority, as stated before, is the testimony of the agent himself. The written communications from Blydenstein to him clearly informed him that possession of the property could not be given prior to January 1, 1933, unless the purchaser was willing to assume his contract with Lilly, and in the contract declared on, the agent, in the name of the owner, promised possession on August 1; Blydenstein stated that he was willing to take $2,300 for the property, but unless the purchaser made settlement with Lilly he would lose $450.

It will be noted that the owner was in Florida and Dally and the property were in Augusta county, Virginia, and at the time he refused to execute the deed the only variance which he knew that Dally had made in the terms and conditions of sale fixed by him was the failure to inform the purchasers of Lilly's rights in the property. He had taken the precaution to inform Dally in writing of his contract with Lilly at the time he listed the property for sale. As soon as he was informed of the sale and before receiving the deed, while, as he stated, he was waiting for a contract, he again notified Dally that Lilly's contract would have to be assumed by the purchasers. When he received the deed he returned it to Dally, with the request that this oversight be corrected. When he received Dally's letter stating that he had sold the property free from the rights of Lilly, he immediately wired him that he had made other disposition of the property. The ef-

fect was to decline to consummate the sale because of this variance. While the purchasers had on August 1st recorded the contract signed by Dally, Blydenstein never saw this contract and did not know its terms until the day of the trial.

There were other variances between the terms and conditions fixed by the owner and those agreed to by the agent. The trial court held that under the authority of *White* v. *Bott,* 158 Va. 442, 158 S. E. 880, 883, 163 S. E. 397, the owner was limited to the one variance upon which he had based his refusal to execute the deed. In this ruling we think there was error.

The facts in the case of *White* v. *Bott* are distinguishable from the facts in this case. There the misrepresentations relied upon to repudiate the contract were that Etheridge falsely led Bott to believe that the property he was to take in part payment was in good condition, and that it was occupied and tenants had renewed their leases, while the proof was that *after* Etheridge made the alleged misrepresenations and *before* Bott signed the contract, he inspected the several properties in question in order to satisfy himself in regard to them. There were several minor defects in the title and description of the property which were known to Bott at the time he declined to consummate the sale which were not disclosed by him to plaintiff until three or four days before trial. The court held that "Where a party gives a reason for his conduct and decision, touching anything involved in the controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and different consideration."

That principle does not apply to the facts in the present case. The only variances known to the owner between the conditions fixed by him and those made by the agent were the date possession of the property should be given and the failure to make provision for Lilly in the contract, but when he had an opportunity to read the contract which Dally had signed, Blydenstein insisted that it was

not in accordance with the authority he had given Dally, and reiterated on the stand that the main reason he refused to consummate the contract was on the ground stated, but under the circumstances he is not estopped to show other variances. His conduct has not been inconsistent.

Blydenstein's telegram authorized sale at $2,300 upon terms of $1,000 cash and balance in one and two years; his previous instructions in writing had been that settlement of the purchase and payment of the purchase money must be made at the 'National Bank and Trust Company in Charlottesville. The contract signed by Dally fixed the terms at $100 cash, as earnest money paid to Dally, $900 on delivery of the deed on or before August 1, deferred purchase money in two instalments in one and two years, with interest from date of sale, but with the right to the purchaser to anticipate payment, and if on examination the title proved defective and such defect was not cured by the vendor in a reasonable time after notice, the agreement became void and all money paid thereunder was to be refunded; settlement was to be made at the office of Dally in Waynesboro. This is not in accordance with the authority given and is sufficient variance to invalidate the contract. See *Voyentzie* v. *Ryan*, 154 Va. 604, 153 S. E. 688; *Seergy* v. *Morris Realty*, 138 Va. 572, 121 S. E. 900; *Halsey* v. *Monteiro*, 92 Va. 581, 24 S. E. 258.

The last paragraph of the contract reads as follows:

"The parties to this contract hereby acknowledge and agree that W. L. Dally is the Agent who brought about the sale or exchange of the property herein sold or exchanged, and evidenced by the signing of this instrument, and the Seller agrees to pay to the agent (or his accredited representatives) the sum representing the commission agreed on. Be it further understood, and it is hereby agreed, that the deposit made by the purchaser as evidence of good faith and acknowledged herein by the Agent, in the event of the failure or refusal, or both, on

the part of the purchaser to comply with this contract, shall first be subject to the payment of the commission hereby earned."

In this paragraph, the agent, acting for the owner, makes the owner promise to pay him, the agent, commissions for making the sale and appropriates to his own benefit all money paid by the purchaser in the event of failure or refusal on the part of the purchaser to comply with the terms of the contract. Such a provision in a contract executed by the agent, for and in behalf of the owner, for the agent's benefit, is not productive of good business ethics.

The agent's failure to communicate to the purchasers the undenied terms and conditions upon which he was authorized to sell was fatal to the validity of the contract, and in no view of the case are plaintiffs entitled to recover. It is, therefore, useless to discuss the other assignments of error.

For the reasons stated, the judgment of the trial court is reversed, the verdict of the jury set aside, and judgment will be here entered for plaintiff in error.

*Reversed.*